We have a chief for counsel here, thank you. Mr. Chamagam, you've reserved two minutes for rebuttal. So that gives you eight minutes out of the gate. You may proceed. Great, thank you Judge Sullivan. My name is Cameron Chamagam of Paul Weitz for the Goldman Sachs Appellants. May it please the court, in recertifying a class in this case, the district court misconstrued and misapplied the legal framework that the Supreme Court established in its intervening decision. For identifying price impact in inflation maintenance cases. The Supreme Court described the generic nature of a misrepresentation as important evidence of the lack of price impact. And it further directed the court to compare the claim to misstatement with the asserted corrective disclosure to determine whether there is a mismatch. On remand, however, the district court did not rigorously analyze the challenge statements and how they matched up with the disclosures. Instead, I think that the district court misapplied the legal framework. We would say that the ultimate decision here is reviewed for abuse of discretion. But if the district court misapplied what this court itself described as the legal framework that the Supreme Court clarified and expounded upon, that is legal error. And the respects, Judge Wesley, in which we submit that the district court misapplied that framework were first by lumping together the claimed misstatements. And then second, failing to identify... And I know you want to lay out... Go ahead and finish laying out your contentions, but I want to start with that error and explore that with your brief. Sure. So I think, and I do think these are related errors. First, the lumping together of the claimed misstatements and the erection, I think, of a high threshold of exceeding genericness. But then I think probably even more significantly, really failing to identify the corrective content of the disclosures, which is really critical in matching up the statements on the one hand... What is the problem with lumping them together? I'm not quite sure what you mean by that. Sure. So I think that the district court, and plaintiffs now essentially do the same thing at page 39 of their brief, effectively concede that the statements of business principles standing alone would be exceedingly generic. And I think what the district court essentially did was to recognize that, but to suggest that the statements of business principles... Well, some of the statements were pretty generic, but some of them are more specific. We have extensive procedures and controls that are designed to identify and address conflicts of interest. I'm happy to go to those directly, and that is the so-called conflict warning in the statement of risk factors. And I think that that is basically what the plaintiffs are now relying on. And you will be aware, Judge Chin, we suggest that at a minimum, even if the court disagrees with us on the bottom line, that it ought to make clear that the statements of business principles are really at this stage out of the case. But I want to go directly... Go ahead and finish. I apologize. I want to go directly to the conflict warnings because I think that the critical point here is that these conflict warnings first were themselves very generic. They did not provide any detail about the procedures themselves. At most, they indicated, which is really uncontroverted, that Goldman had extensive procedures and controls. Well, I recognize that the nature of Goldman's business created the potential for conflicts. Goldman does proprietary trading. Goldman is a market maker because it's an investment banker. And Goldman advises individuals with regard to their own individual investments. And so, therefore, at times, Goldman may be trading for its own interests, which might be contrary to the investments that they're advising their clients as to. Is that the case? That is true. So by its nature, by its nature, its own structure, and that's what... let's take, for example, J3278. Sure. We have expanded the scope of our business, our client base. We increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other investments conflict or are perceived to conflict with the interests of another client as well as situations where one or other businesses have access to material information. Then that disclosure goes on to identify a specific antitrust action where there's problems. And then it closes. So if Goldman is disclosing, and this is not generic, this is specific to Goldman. Is it not? Well, that particular disclosure of a particular... Do you think it's generic, Mr. Shumlin? I think that it is generic. Right as a whole, absolutely. As a whole? Well, to be sure... Do you have any antitrust disclosures? To be sure, there are disclosures both in that statement and then later on of particular pieces of litigation. So let's go to the later on. Let me go to the later on. Because later on at the end of it, it says, however, appropriately identifying and dealing with conflicts of interest is complex and difficult and our reputation could be damaged and the willingness of our clients to enter into transactions in which such a conflict might arise may be affected if we fail or appear to fail or identify and deal appropriately with conflicts of interest. Yes, I would say three things in response to that. Absolutely, all of that was contained in the conflict warning. But the first thing I would say is that this was a conflict warning. It was not a warranty that conflicts would not arise. It was, after all, contained in the risk factors and the whole point was to warn about the risk of failing to identify conflicts. The risk of a conflict. Would it be misleading if the conflict indeed existed at the time this statement was made? No. It would not be misleading if there were conflicts of interest. Because, again, look at the other language contained in the conflict warning. And this is the fundamental point. You just told me that this is an identification of a risk, potential risk by the nature of the structure of gold. And now I ask you, if the risk did exist, and plaintiffs pledged that the risk did exist at the time this was made, there is no duty to disclose that? The whole point of the warning was that the risk existed and indeed was increasing. The first line, conflicts of interest are increasing. So if I told you, sir, that by the nature of my business, I have the potential for real conflicts of interest, and I have to be careful about finding them, and I know that one exists currently, so I identify a risk that's a danger to my business, and I know that it exists, I do not have to disclose it? So our view is that there is no affirmative burden of disclosing particular conflicts that comes from this statement. And yet this is the critical point, I think, for purposes of this appeal. Because this is where the mismatch arises. Let's say that it turned out that Goldman, in fact, did not have, in the words that Judge Chin focused on, extensive procedures and controls. Let's say it turned out, for instance, that Goldman didn't have any procedures or controls at all. Then I would grant you there's not a mismatch. But that is not what was — But if the kid had a risk, they don't have to disclose it? The risk of, or even the fact that there are conflicts, no. That does not create a mismatch. And keep in mind, that's what we're really discussing here. What do you say to Credit Suisse? The Credit Suisse case where they structured the deals and they said it may cause a conflict of interest. And this Court said, well, you didn't disclose that it would cause a conflict of interest. And that was a misstatement, inconsistent with the requirements of Subsection B of the statute? I do not think that a statement — and again, I think that the most that can be said about this statement is that it was a statement that said, first, we have extensive procedures and controls in place, and second, that failing to identify conflicts poses a risk to our business. Now, let's talk about the corrective disclosures, because I think this is a hard discussion to have, focusing on only one part of the analysis. If you look to the corrective disclosures, those corrective disclosures didn't even disclose the fact of the conflict, specifically the fact that there were alleged conflicts in the Abacus and Hudson CBOs, because those facts were already in the world at large. And so the question is, what was truly corrective? And let's talk in particular about the first of the disclosures, the SEC enforcement action alleging misrepresentations in the sponsorship of the Abacus CBO. That's April 16th. Correct. Now, if you take a look at Apolli's brief here, what Apolli says at page 57 of their brief is that it was the revelation that Goldman lacked extensive or even nominal conflict control systems. But there was no such revelation in the SEC's enforcement action. The SEC's enforcement action didn't talk about Goldman's conflict systems at all. The most that could be said about it is what Judge Cotti said, which is, well, the SEC enforcement action provided some additional granular detail. The suggestion is the disclosure made clear that whatever procedures and systems were in place were inadequate, that they weren't up to the level that had been represented. I think that the most that can be said. Some connection there. I think that the most that can be said, Judge Chan, and I think that this is really plaintiff's theory when you boil it down, is that Goldman reached a substantively incorrect result by failing to disclose conflicts that it had in the Abacus CBO. And I think the reason why it is so important to focus on what was new about the SEC's complaint is that that is the corrective disclosure that you have to match up with the statements. And if I could ask my friend Mr. Goldstein a question, which sadly I can't, but you can, I would ask him what exactly is it about that enforcement action that was new. And if it is simply that it provided a little more meat on the bones around this particular conflict, I would say that that's a paradigmatic example of a mismatch. That is a greater mismatch. Is your argument a factual one that the district court committed a clear error here and it's factual findings or is it more of a legal argument or what? It seems to me a lot of this is factual in nature and then you have the factual findings and ultimately we get back to abuse of discretion. So I'm wondering what is it that you're really relying on here? Judge Shin, we would certainly say that the district court erred under any standard, but I think at the bottom it's a legal error because it is a misapplication of the mismatch standard. Let me point you to where I think that error resides in Judge Crowdy's opinion. If you take a look at pages 26 to 27 of the special appendix, that is the paragraph in which he really engages in the mismatch analysis. It's six sentences long. And ultimately his conclusion was that the corrective disclosures, although somewhat more detailed and narrow in scope than the corresponding alleging statements, implicate the same conflicts of interest in Goldman's infrastructure. There's a sliding scale of genericness, assuming that's a word, and you look at it and I'm wondering whether you're back to your original argument that really as a matter of law, the generic statements here are so generic they're entitled to zero weight. Is that more of a legal argument or what? He does seem to follow the Supreme Court's admonition to look at the expert testimony, to apply his common sense, to consider all the evidence. I think at bottom, here's how I think Judge Tinn the analysis should have gone, and then I'm happy to match it up to what Judge Crowdy actually did. I think that the way that Judge Crowdy should have conducted the analysis is that he should have looked particularly at the statements, again, rather than simply lumping them together, and matched them up against the corrective disclosures. And that required, in part, that he identify what was truly corrective about these disclosures. And again, there's no dispute that the fact of conflicts in the Abacus CDO and the Hudson CDO were recorded in the New York Times and other news outlets prior to the corrective disclosures. Then, I was just going to say, Judge Wesley, that if you have a mismatch, it undermines the central inference that supports the inflation maintenance theory, as the Supreme Court said. Namely, that a back-end price drop is a proxy for front-end price inflation. The Supreme Court has said that's important evidence of the lack of a price impact. It's a lot tougher where the issue is the misleading statement. You know, Vendee was a truth and falsity situation. And a number of the other cases is where there's a false statement, and then the truth comes out. This is more akin to an alleged misleading statement. That then the fullness of everything that goes on, because their theory is that it wasn't disclosed, that there actually was a conflict going on that never was disclosed and should have been disclosed. But I took Judge Crotty's decision to say, look, Finnerty here took a look at these, and he said the market was concerned. The RAM list, notwithstanding what Dr. Starnes had said, who never testified at the hearing, Golden never saw fit to put him on the first time that there was a hearing in front of Judge Crotty. But Starnes kind of focused on the generic side of that. And I think your criticism about the more generic, reputational stuff has a grip. But the real rubber meets the road with regard to the conflict statements. For me, at least, whether there was a duty to speak under the statute in the misleading context, and how Vivendi maps onto that. So let me finish. So he says, well, Finnerty looked at this and says, you've got to be aware of the fact that market analysts were talking about it. There was a Merrill Lynch, there was a CIBC, there were a number of various people that were speaking about it. And then he also looks at the press coverage after, and the New York Times article that's extraordinarily critical of Goldman, in May, I think it is, of 2010, so that's after the first disclosure. And that article says, the real damage to Goldman is its reputation in the market. Now that's in the air. That's people talking about it. And so what he says is that he then buys into, he accepts Finnerty's opinion that they're intertwined. And it's as if there's a message and there's a messenger. And he said, it's not my job to separate how much the dip is because of the messenger, the SEC, or how much the dip is because of the message, the misstatement that he characterized as that. Who had the burden to separate the two and show that it was solely the messenger? Sure. So there's a lot to that question, Judge Rossi. I think I have the least of things to say. I'm sure you do. I've never seen you to be short. Okay, well, I'll try to be... Always informative. I'll try to be informative and relatively brief. First, I would say that if you think that our point on the statements of business principles has traction, that at a minimum, the court should make that clear to greatly streamline the proceedings going forward, particularly if this case ends up in a trial. Second, I would say that with regard to the mismatch, I think what Judge Crotty should have done, and this goes to Judge Chin's question as well, is that once he concluded that there was a mismatch, both in terms of genericness and in terms of content here, because the corrective disclosure at most provided confirmation of the conflict, but then the question is... Can I ask you a real quick question? Is that a fact question or a law question, the level of genericness? I think it is a... Is it your perception of a statement versus mine? I mean, I think perhaps we could disagree about that, but ultimately this goes to the application of the Supreme Court's own legal framework. And both Judge Crotty recognized the genericness of the statements, including the conflicts warning at various points of the analysis. I think the problem really came in primarily with regard to the mismatch. And what should have happened at that point, and this takes us to Finnerty, is that the Supreme Court clarified that this is a preponderance of the evidence standard, that the genericness and the mismatch is important evidence on the defendant's side. Once that's proved, the question becomes, what evidence is there on plaintiff's side? And really, plaintiffs point only to Dr. Finnerty. And the fundamental problem... One is enough, isn't it? Well, except that... One good witness is better than three bad ones, right? Except that he has... I'm not saying the other three were bad. I'm just being argumentative. Except that he asked... Well, I am too. That's my job. And he asked the wrong question. Okay. He asked the wrong question because while he conducted an event study, all that the event study showed was that Goldman's stock price declined on the dates of the three corrective disclosures. He made no effort to disaggregate the two things to which you refer. Why does he have to? The burden of persuasion still is with you. Correct. You fought that Supreme Court and you lost that battle. You had a couple votes, but you didn't win it. But the Supreme Court made clear that it is a preponderance. If the evidence is in equipoise, the class action proceeds. But you have to... The judge didn't have the responsibility, nor did the plaintiffs have the obligation to disaggregate it. They didn't have to assign percentages. You had to show that it was the sole cause for the price. As long as the disclosures played a 5% causal relationship to the stock drop, the class action continues, does it not? But the plaintiffs... Let's start with an answer to that question. I think the answer to that question is no for this reason. Okay. Once you have generic statements and a mismatch, that is evidence. If you think about the preponderance standard as the balancing of scales, that is evidence on our side. The question then becomes, what do the plaintiffs have on the other side? And it's not enough for the plaintiffs at that point simply to say... No, the claim is on you to show that there is no price impact. The words are no price impact. Correct. I agree with that. So you don't meet that until you show that there is no other cause of price impact. Correct. But the Supreme Court's key chain... But the Supreme Court's key chain is that genericness and mismatch are evidence of the absence of price impact. And to be sure, not dispositive evidence. And this is Judge Chin's point. I think when you say genericness and mismatch, it's not like a bright line. They can both move up and down. And so it's inherently a balancing, a weighing of all of the circumstances, including the testimony of the experts. Well, I agree with that, which is to say that we are not here saying that the plaintiffs can't come forward with testimony that despite an evident mismatch, there is nevertheless price impact. Our point is simply that under an ordinary application of the familiar preponderance standard which the Supreme Court embraced, the plaintiffs have to come forward with some contrary evidence once you have a mismatch, because the Supreme Court's key chain is that the genericness of the statements and the mismatch are evidence in the defendant's favor in that preponderance inquiry. And I don't think it's enough... There's no doubt that that's the case, but it doesn't establish that you've met your burden. It's only something we have to consider. The Supreme Court sent it back to us to ensure that we considered that fact. The plaintiffs can, as I said a minute ago, come forward with evidence of their own. But the fundamental problem with Finnerty is that he made no effort to disaggregate those two things. The effect of the news of the enforcement action on the one hand, and the supposed revelation that the challenge statements were false. And keep in mind, you've got to identify what exactly that is. It's not enough to say, oh, it's the revelation of the conflict in the abacus CDO, because that was already out in the market. And Judge Finnerty, Dr. Finnerty, by his own admission, made no effort to engage in that analysis. If you're thinking about this in preponderance terms, I would say that it would take pretty compelling evidence to overcome a mismatch of this variety under this sliding scale. But the problem is that Finnerty did not ask the right question. Is it your view that while the market may have been interested in it, since people were writing about it until the SEC commenced an enforcement action, no one used that concern to make an investment decision? Well, you alluded to one other aspect of this, which is that people were certainly writing about the effect of an SEC enforcement action on Goldman's reputation. And indeed, Dr. Finnerty, when he was criticizing our expert, Dr. Sarks said, Dr. Sarks was focusing on the wrong thing. She was focusing on the statement. She wasn't focusing more broadly on whether investors cared about Goldman's reputation. But our submission to this court is that to the extent that Dr. Finnerty said that and to the extent that Judge Crotty accredited that criticism, that that was the wrong inquiry. Because the right inquiry here is not the effect on Goldman's reputation. It's whether or not the statements were proven to have price impact by virtue of the subsequent price drop. And that requires focusing indeed on the significance of the statement. Now, I think that Dr. Sarks, our witness, confirms what common sense would indicate, which is that statements of this variety were not statements to which analysts attach weight, that these statements, including statements on issues like conflicts, were commonplace in the industry. District courts say that all the time. We have a healthy line of cases in which we affirm dismissals of complaints on a 12b6 because we say certain statements are mere puffery. Correct. So does that have any – I mean, I'm trying to figure out if there's any daylight between the puffery that is often stated as the basis for dismissing on a 12b6 and the generic statements that are being considered on a 23b6. So, Judge Sullivan, as you are aware, we point out in our brief that the statements at issue here, including the conflict warnings, are comparably generic to statements that this court has repeatedly held are too generic to be actionable at all. And the teaching of footnote two of the Supreme Court's opinion is that a court can take into account evidence that might also be relevant to materiality when conducting the price impact analysis. And so we rely on those cases not on the grounds that they're somehow dispositive here, but simply because they indicate what common sense would indicate itself, which is that such generic statements typically will not affect a company's stock price. Now, Judge Wesley, you asked – Do you think that Judge Cronin didn't agree with you characterizing the conflict statements as generic? He saw them as being more particularized in the sense that they were identifying that Goldman was a business that operated in an environment where the nature of their business was such that they would have a conflict issue. That's more than just saying we're a good company or we're comfortable with our business model. That's very – it's not – we have this extenuated conflict resolution process, and therefore we catch all of our conflicts. I mean, there are levels of generality in any kind of representation. I think the point that that may be a place, actually, Judge Wesley, where I think the materiality cases are actually helpful as a guide, because I think that when you look at the conflict warning here, I would invite you to pair it up with the statements in cases like Dansky Bank and Singh and UBS, J.P. Morgan. You know the cases that you cite. I looked at them all. Well, and I think that the two cases on which the plaintiffs rely involve more detail. This statement does not say anything about the nature of those conflict procedures and controls. And again, if there's one takeaway I want to leave the court with from this argument, it's that this was a conflict warner. It was not a conflict warranty. It was contained in the risk – That's exactly what happened in Credit Suisse. They said that Credit Suisse hedging trading may present a conflict. And this court said that because Credit Suisse knew that it would present a conflict, that was a misrepresentation. But I think what's critically different here is that there was no representation. It's a matter of nature. I mean, there's always going to be a difference with regard to misleading statements, a difference between the particularity of the misleading statement and the particularity of the statement that rebutts it, because the misleading statement is always something that's going to be leaving out a piece of information, a material fact necessary in order to make the statement in the light of circumstances not misleading. I take that point, Judge Wesley, which is to say, to take the hypothetical that this court used in Vivendi, suppose that a company says that Model V has passed all safety tests, and it turns out it in fact had failed one safety test. Yes, that's more specific. But you would say that that's still corrective. The problem here, though, is a mismatch not just in specificity, but also in content. And again, this would be a different case if the corrective— I'm having a hard time understanding what you mean, because Goldman says the way we're structured, we inherently have a problem. We have potential for confidence. Correct. Okay? And the allegation, in fact, in the Siemje findings, the allegations in the complaint, which are set out in Judge Crowdy's original opinion of 178, 179 of the joint appendix, said that Goldman knew that they were conflicted and they were shoring up and that they were paying a premium to Paulson, and Paulson had negotiated and got a premium to be able to pick the lousy mortgages that went into Abacus. Okay? And there's allegations with regard to the head of Goldman. So, if they knew that they were conflicted, why isn't that, given the fact that they're worrying about the potential for conflicts by the way they do business, why don't they have a duty to dispose of it? Judge Lesley, two points on that. First, the issue before the court here is not falsity or tantor. Those are summary judgment issues. The issue here is— Well, Clause 2 tells us that we can look at any aspect of a claim to determine whether it has in any way, shape, or form specificity and or how that relates to price impact, doesn't it? But the task before this court is to zero in on the corrective disclosures. Whatever else might be alleged in the complaint, the question here is what was contained in the corrective disclosures and how does that match up? And this is why you talk about an affirmative duty of disclosure. This is, I think, the great hazard that this case presents. You indicated yourself that this case is somewhat different from the Vivendi. I would certainly agree with that because I think in Vivendi, one can quibble and we quibble a bit in the brief about how perfect the match was. It was a pretty close match. The great danger here is that I think that this— the reason why we think that this is an extension, a dangerous extension of the inflation maintenance theory is precisely because when you don't have that close match, as Justice Barrett indicated in her opinion for the court, the central inference that supports the inflation maintenance theory starts to teeter because you can no longer certainly infer front-end price inflation. Now, why I think that is really important, just to put a little more meat on the bones of this, is because, as you will be aware from our briefs, we suggest that the correct approach under the inflation maintenance theory is to compare the price that follows the inflation-maintaining statement with the hypothetical price that would have followed silence. This court in Vivendi went a little bit further than that. It suggested that the comparator is the price that would have followed a comparable truthful statement. But I think in order to apply the inflation maintenance theory here, what we're really doing is looking at the price that would have followed from the more specific disclosures, the disclosure of the fact of these conflicts. And that is effectively creating an affirmative disclosure regime whenever a company makes general statements about its integrity or reputation. I'll give you that. As my questions reveal, I'm having a hard time seeing some of these conflict statements as being generic. Well, let me ask you this. We are dedicated to complying fully with the letter and spirit of the law. So if it turns out that a company has that statement in their principles and they know that they've got an employee who has committed crimes and is under investigation by the U.S. Attorney's Office, I guess that statement implicates what's going to later be a pretty heavy news article about a corrupt person in that company. And so they better disclose everybody who's under investigation. And, Judge Sullivan, I think that that's why this case really matters. I understand the temptation to think that on some level this feels like a case-specific issue. But if the court says that this is an appropriate use of the inflation maintenance theory, you are going to have happen what I submit took place here, which is that upon the disclosure of any misconduct, and not just actual misconduct, but alleged misconduct, however unproven, an enterprising lawyer will be able to go back and find an aspirational statement of that variety and say, We can argue that that statement maintains inflation in the price, which means we no longer have to show that the price actually went up. And we can just point to the fact that the disclosure of the alleged misconduct caused the price drop. And no matter the mismatch, that gives rise to securities liability. So I want to ask you another question after this. Now give me, then, the level of specificity you would have required Goldman to have said for that to have been a mistake. Well, this Goldman had said, We have no conflicts of interest. Of course, if it turns out that Goldman has a conflict of interest, you have a perfect match. That would be a very specific representation. And you're saying that has to be perfect? It does not have to be perfect, but it certainly has to be close. The example I gave you earlier... The Supreme Court didn't say that a mismatch... I violated my own rule, and I asked another question. The Supreme Court didn't say that a mismatch required disclosure. They wouldn't have sent it back to us if the mismatch had done it. They sent it back to us to consider it, didn't they? And we are not saying that the mismatch is dispositive. At the same time, this Court recognized when it sent the case back to Judge Crotty that the Supreme Court had clarified the legal framework, and it referred to the mismatch analysis as a new idea. And I do think that it is, with respect, this Court's job faithfully to apply that framework. We are not here saying that the mismatch is dispositive, and we're also not here saying that there has to be a perfect match. And my Model V example, I think, is an example of a case where you're not disproving the entirety of the statement, but we would say that there is nevertheless a match. Our fundamental submission is that Judge Crotty operated at an impossibly high level of generality, looking only at the subject matter of the corrective disclosures, not identifying what was truly new and corrective, which is fundamental to the mismatch analysis. And at that point, once you have a mismatch, our submission is simply that that is important evidence that has to be met under the preponderance standard by evidence that is at least as strong as to price impact. And because Dr. Finnerty did not conduct the right analysis to attempt to disaggregate the understandable effects on the market from the announcement that the SEC was filing a complaint against Goldman Sachs... Well, in the base of a record that included 36 disclosures of conflicts that didn't move the price, right? Correct. And I'm not here to relitigate the more fact-specific issues concerning our experts. Our fundamental submission is that under the Supreme Court's framework, you don't even need to get to those experts. But I will point out that one flaw with Judge Crotty's approach was that he faulted our expert, the renowned Dr. Gomper, for not focusing on these allegedly additional details. He discounted Gomper's analysis of the 36 times on which the conflicts had been disclosed to the market by saying, well, the SEC complaint contains some unspecified additional granular detail. And that, to us, illustrates the flaw with his mismatch analysis. You can't have it both ways. If you think the granular detail is what matters, you've got to match that up with the generic statements to determine whether or not there was a mismatch. But I want to be clear on something, sir. Are you suggesting we don't even get to the experts, that we can look merely at the generic quality of these statements and using what feels like a 12B6 analysis to say, no rational investor could have relied on this investment? Is that what you're saying? Not quite what we're saying, Judge Sullivan. I think what we're saying is that the court is weighing various things in determining whether or not there is price impact. In our view, the Supreme Court has said that where you have a mismatch, important evidence of no price impact, look at what the plaintiffs have on the other side. All they have is Dr. Finnerty, who didn't conduct the right analysis. At that point, under a preponderance standard, when you have something on one side of the scale and nothing relevant on the other side, that should be the end. But I guess I'm trying to figure out, on a 12B6, we would be saying that we're going to dismiss this before we take any discovery, before we have any experts, because we're saying that these statements, on their face, are not ones that a reasonable investor would have relied on. Correct. So if a district judge blows that analysis, denies the motion, and then on Rule 23 there's a motion to certify the class, now it's a higher standard and now you've got to bring in experts? Or is the court free to say, I'm just looking at the generic statements and deciding whether or not these amount to something a rational investor would rely on? It is a different analysis, but there is obvious overlap because both at the 12B6 stage, when you're analyzing materiality, and at the class certification stage, when you're analyzing price impact, you're looking at the statements. They seem awfully alike. I just said last time I was accused of smuggling materiality into this thing. I think you were both right the last time around, which is to say that the Supreme Court has made clear that they're not the same inquiry, but in footnote 2 it indicated that it was an overlapping inquiry. But I think what I would say is hypothetically, will there be situations where these statements are so generic that a court could say at the Rule 23 stage there's no basis to conclude that there was any price impact from these generic statements? The more generic the statement and the greater the mismatch, the more there is a corresponding obligation. I don't know what any of that means, though. That's what the Supreme Court said. The greater the mismatch, the less likely... At that point, the plaintiffs have to come forward with compelling evidence that notwithstanding the mismatch and common sense, which indicates that when you have a mismatch, it's unlikely that there's price impact. They have to come forward with compelling evidence that there was price impact nevertheless. That is how this differs from the 12B6 inquiry. But I grant you, we obviously take the position that these statements are immaterial. We think that the Second Circuit cases on which we rely, now more than a dozen, plainly indicate that statements of this variety would qualify, and the oddity of where we are procedurally is that that's an issue that is now once again pending on summary judgment before Judge Crotty and on which we think we should prevail. My point is simply that those inquiries are not the same, and the difference is that both sides have the ability to present expert testimony. Now we certainly think, even though we're not litigating the issue before this Court, that our experts confirm what common sense would indicate, which is that with this mismatch, you don't have price impact, that the price decline was attributable to what was new, which was the news of the filing of an SEC complaint. But we're not here to litigate that issue other than to point to the fact that to the extent that Judge Crotty at various points has attached little weight to the various aspects of the testimony of our experts, I think that is because he has faulted them for asking the wrong question when, in fact, all of them asked the right question. In Judge Starks' case, whether analysts and others attached weight... You've promoted Professor Starks to the bench. Sorry, I don't know why all the experts... I know what these experts get paid. I don't know why I'm confirming all these experts to the bench, and I apologize, but I think Dr. Starks at least was worthy of more weight, if not life tenure, because I do think that Dr. Starks asked the right question, which is, did people attach weight to the statements? Dr. Gompers asked the right question, which is, if the market didn't move in response to the disclosure of the conflict, was the fact of the disclosure of the conflict something that had price impact? And Dr. Troy at least made an effort to disaggregate the effect of the SEC enforcement action from these sorts of statements by looking at the admittedly small population of comparable cases. And while Judge Crotty found fault with some aspects of his methodology and argued unfairly, at least he was asking the right question. Dr. Finnerty was not, and he effectively conceded that he made no effort to do so. And while my friend, Mr. Goldstein, the last time he was before this court, suggested that Dr. Finnerty in fact did disaggregate those two things, I would respectfully submit that he plainly did not. At most, it could be said that he tried to lump those two things together and say that there's no need to disaggregate because surely there must have been some price effect. That's speculation. That's not evidence. Can I ask you one thing, and then we've got to hear from your adversary, but you started to answer the question about why Credit Suisse was a distinguishable or different from this case, and I don't think I heard the answer. I think that one potential reason to sort of distinguish those two things is it's one thing to sort of have a case in which you say something like, you know, we don't think there's any conflict in a particular context, and there is, for instance. But I think what is different about this case is that you don't have any sort of representation about the existence or not of conflict. The representation here is that Goldman had extensive procedures and controls in place, and I don't hear plaintiffs to say that that was not the case, or at a minimum, I don't hear them saying that anything in the corrective disclosures indicated that. That's the key. It's what's in the disclosures, right? Correct, because again, we're not here litigating the issue of whether or not any of those statements turned out to be false. What we're here litigating is the specific issue of price impact and whether something in these identified corrective disclosures is probative of the falsity of the statement. It's not whether there might be some other evidence to that effect. I'm sorry to belabor this, but it seems to me that if common sense or experts or some combination of the two lead to the conclusion that the generic statement had no impact on price because no investor would attach any significance to it, that's pretty much the end of the inquiry, isn't it? It is, unless, again, and this may be more hypothetical than real, the more of a mismatch you have. Unless the plaintiff can come forward with expert testimony that is probative, that somehow indicates that notwithstanding that mismatch, there nevertheless was price impact. And I strain to suggest that that's anything more than hypothetical because, again, when you have statements this exceedingly generic and when you have this much of a mismatch, it's hard for me to imagine that any expert could credibly so testify here and plaintiff's expert didn't even try. And so that's why I think it's conceptually important to maintain this distinction because it is what distinguishes the price impact analysis from the materiality analysis, which is a question ultimately of law. What would a reasonable investor have thought? But nonetheless, there's very little daylight the more of a mismatch you have precisely because the inference, which is the key to having inflation maintenance, as this court said in Vivendi, breaks down. You can no longer be certain that the back-end price drop is probative of front-end inflation, which is so central to this theory because by virtue of the fact that it's an inflation maintenance case, the defendant does not have the ability to disprove front-end price inflation in the way that they do in an ordinary securities case. All right. I'm going to leave it there. I've got two minutes for rebuttal. Mr. Goldstein, you've got ten minutes, but if you have an appointment at four, I would suggest maybe you make a call. Thank you, Your Honors. May it please the Court, Tom Goldstein, Hello again, Judge Wesley. Hello again, again. The last time the case was before the Court, we didn't argue it was coming back from the Supreme Court, and we had said, hey, rule for us is a matter of law, and the other side said the opposite, and you said, no, you're both wrong. We have to send this back to Judge Prady because, quote-unquote, this involves fact-intensive issues that are best resolved by the district court in the first instance, and you reiterated that those fact-intensive determinations would be reviewed for clear error, and clear error was, of course, at the heart of the Court's last ruling before the case went to the Supreme Court, and the Court said quite clearly, well, look, whether we would agree or disagree isn't the question in front of us. This is a very fact-bound thing with a bunch of experts and testimony and evidence. Judge Prady came out one way, and we can identify a clear error there. So clear error is at the heart of the case, but some people can't take a hint, and Goldman Sachs still continues to just attach the word legal to what are fundamentally fact-bound disagreements. So my friend... The argument is that there was legal error in lumping the statements together. How do you respond to that? There's no lumping here. It's that the theory that gave rise to the judge's conclusion, he found as a matter of fact, that there was a good reason to believe there was a price impact is the same with respect to each of the disclosures. So what we have to ask here, is there a mismatch between the corrective disclosure and the impression in the marketplace that is created by the statement? And the statement, you have to remember, is false. That's been determined as a matter of law in the case for these purposes. Well, if you're deciding whether there's a mismatch, should you be looking at a specific statement? Yes. All I'm saying is... Break the impression given to the market. So which is it? The reason is the same for all three. That's why Judge Prady didn't have to break them down by one versus the other. And this is reflected in the Merrill Lynch Merrill Lynch's conclusions. There's a Wall Street Journal article. What each one of those did was negative the impression that Goldman Sachs had created that it did have effective procedures for handling the conflicts that were endemic in its business model. And when you have each of these disclosures, and I think that the strongest one is certainly the SEC action, but the others are additive and make the same point. They begin to show the marketplace that despite Goldman's consistent denials, this is a huge problem. And Goldman doesn't actually have its arms around it. And the reason that we have a premium on Goldman Sachs, which we thought was that they could navigate these very troubling waters, turns out not to be true. Is that the disclosure about the SEC filing in the force plan? There's nothing in there about having systems in place. In terms of the SEC, it doesn't have a line in their second line. Why is there not a mismatch there? Because it is apparent that Goldman, from the action, we know that what happens is the marketplace comes to the conclusion that Goldman doesn't have effective practices and procedures in place. I can point you to two things. One is simply a fact, and that is on the day of the corrective disclosure, Goldman's stock value goes down $12 billion. And the other side's theory was that, oh, that was just a reflection of the cost of the action. And nobody seriously thinks, and nobody would credit the idea, that rather than the $450 million fine that Goldman did pay, which admittedly was significant, that that compares to the $12 billion in lost value to the company. But there was very specific evidence, some of which Your Honor pointed to earlier, where the market says, this is really affecting Goldman's reputation because we lose faith that they have means for addressing these conflicts. So I'll give you an example. This is ECF 201-11. It's the Wall Street Journal on May 10. The quote, premium has dissolved because the market is worried not about lawsuits or politics, but about Goldman's core business. Quote, the perception that it can do both simultaneously, which is invest its own book and be on both sides of the transaction, is quote, why its stock carries a premium to its peers in a bull market. And that's what the corrective disclosure does. It doesn't,  there was some specific representation by Goldman about abacus, and this is all about abacus, one single transaction. It is the question of, hey, is Goldman special? Is it better at this so that as compared to other investment banks, its stock should trade at a premium because it is the one that has figured out the special sauce for being able to make money directly as an investor and also as a market maker and a creator of these products. Well, can you take a fact to the hypothetical I posed before, which is, you know, a generic statement about complying fully with the letter and spirit of the law is when you know that you've got somebody who's under investigation or in fact committed crimes and you're dealing with the Department of Justice on that. Right. No, that case is a loser because it's an immaterial statement. The big difference between... Because it's a what? Because the statement is an immaterial one. The original statement that we comply with the law... So what's the difference between that and our reputation as one of our most important assets we increasingly have to address potential conflicts of interest? Well, if you were to just stop there, probably nothing, but that's not the statement. There are two I think that you should be really focused on, Your Honor, and I'm not trying to avoid the hypothetical. I'm trying to distinguish it because I agree with your conclusion about the hypothetical. One is, and the key language that Judge Wesley has quoted, is we have extensive procedures and controls that are designed to identify and address conflicts of interest. And there is another, and it gets passed over very quickly in the case, so I would like the Court just to be very concretely aware of it. On the question of conflicts of interest with respect to CDOs in particular, Goldman Sachs issued a press release saying that all the conflicts were disclosed. This is in the complaint at 123 to 143 paragraphs, in which it says that the conflicts were fully disclosed and well-known and the products that it created resulted from investing clients seeking long exposure, which of course was not true in Paulson. So, Your Honor, the thing that I think one has to do in this case at this stage is you take as a given that these misstatements were both false because the District Court has concluded that we adequately pleaded that, and are material, and that is that investors would care about them. Then what you ask is, okay, if you start from the premise that the misstatements are material, what evidence does the other side have that would negative that and get you back to the conclusion that despite the fact that they were material in the abstract, they didn't have price impact? Our point is that you cannot just point to generics. What you cannot do is just turn around and reconduct the materiality inquiry. You can't just turn around and say the reason, despite the fact that there are material, premise one, there is no price impact because they are immaterial. What you can do, though, is there are lots of other things defendants can do. I'll give you one example that Dr. Troy tried. Dr. Troy tried to say, well, look, I know that there was a market response, so we know the corrective disclosure is material. We know the stock price went down some $12 to $15 billion. Nobody thinks, nobody paid attention then. Dr. Troy said, okay, here's my theory. My theory is that what was going on is that the market was concerned about the cost of the enforcement action, and the judge looked at the different competing expert reports on that question, applied his own common sense, realized what the potential fines would be, and the like, and said, no, that can't be everything. I'm confused by what you just said. We're not doing the materiality test again, but the Supreme Court said the generic nature of misrepresentation often will be important evidence of a lack of price impact. Your Honor, I agree, and it is going to be in the mix. My point is that it cannot carry the day. It cannot carry the day. That's something that a court can conclude based on common sense, or there needs to be an expert backing that up? I think that the Supreme Court contemplated that the court would be attentive as a matter of common sense, as is true in the materiality cases, to the generic nature of the statements, yes. But my point is that it has to take the bitter with the sweet is my only point, and that is, the other side keeps saying there can be overlap between materiality and price impact, but they have to take the bitter with the sweet, and that is, when materiality is taken as the premise of the case, you cannot have a ruling that there is no price impact, that is simply saying the statement is immaterial. There is going to have to be more. Yes, the generic-ness is evident, but Judge Cronin's point is this. Because of the basic presumption. Yes. I mean, the case went to the United States Supreme Court because of the basic presumption, and then who has the burden to rebut it? Right. What is the level of the burden? Right. It's theirs. Yes. All right. And so, once you pass materiality, I'm trying to make sense of what you're saying. Once you pass materiality, you're entitled to the basic presumption. Yes. And then they can rebut it. Yes. And one of the ways that they would rebut it, they would say, notwithstanding that you've won the materiality. Yes. I mean, the problem here is the lack of the interlocutory appeal. That's what everybody is worried about. That would have measured the strength of the materiality determination. But that's not, that is my problem, but it's not my problem. All right? And so, so then, so now the question is in front of the court, did it have a price impact? Yes. Did this material statement have a price impact? And, and they, they say, well, we met our burden, and the way we met our, I'm, I'm surmising, yes, I've, I've taken from what they've said. Yes. All right. They say, well, A, your statements are generic, right? And, and to be fair, your business principle statements are far more generic than your conflicts statements. That is fair. Because your conflicts statements are tailored to the fact that the way Goldman does business. Correct. So they're far more goal-oriented than they are goal-oriented. Correct. All right. But then what happens is, is the question is, how do you understand what Finnegan said versus Troy, Don versus Starks, right? Yes. And so that, that's where, where we're at right now. Now, there's, there's no doubt that your expert looked at and said, Starks is wrong because Starks says nobody cares. It's, reputation is ubiquitous. It's like saying this is a good car. Chevy's a good car. Ford's a good car. People will buy, people won't presume that. Everybody presumes that investment advices are not conflicted. Okay. And, and, and Finnegan says, no, people were concerned. But they were, and they were auditory. And Merrill Lynch says, we think Goldman's got a good headline. So Merrill Lynch was recognizing that because Goldman has three hats, it's got potential for problems. But they've managed it. And so, it's in the ether, this, this potential problem. But, but, but Judge Sullivan asked a pressing question that I think really, you have to borrow in on this. Thirty-six times someone publicly says Goldman's got a problem. The New York Times in December of 2007 did an article called The Longest Shore of Goldman Sachs. It really puts it to Goldman Sachs and says they're, they're, they're shorting junk on a stock. Things like that. And the stock doesn't move. So, the Wall Street Journal says the same thing. Rolling Stone says they're selling junk. So, I admit that I am persuaded by the court's opinion on this point ruling in our favor. And I don't, I would not reverse it. A couple of things are. The first is... So, tell me why the affinity handles this and why you think Crowder didn't do clear error in... Well, remember, my friend, in response to Judge Sullivan's question, says we are not here on that question. They are not making the argument that that was clear error. So, that's a good start for us. The second thing is, remember, that we do allege that Goldman's denials of that are themselves false statements. Because the difference is that unlike the SEC action, which has a ton of detail about how Abacus was constructed much more so than other... any of the  those were all accompanied by Goldman's denials. So, what Judge... I'm sorry? All 36? No, not all 36, but a lot of those statements, even those articles, reject the claim. They report the claim and reject the claim. The big differences for the SEC  the evidence  Goldman's denials and you can't... The denial of what the actual SEC files is going to be much less effective. But can I just say that this argument doesn't make sense to me? The upshot of this argument is that conflict issues don't matter. The issue is whether there's an obligation to disclose the level of sensitivity. Frankly, the denials were not focused on the last time we discussed this in the majority opinion anyway. It was really focused on the statements in the 10-K and the statements from 2006. I agree with that. I'm just making sure that they aren't overlooked. But this question, I think we can agree, was resolved in the last opinion. This whole discussion of the 36 statements, my friend has said, he's not raising that here, that's not the point of their argument. The court has resolved whether Judge Quaddi committed clear error or legal error in his assessment of the other statements regarding Goldman's case, including the generic case, which was the dispute issue as to whether materiality could be smuggled back in. It can be smuggled back in. You're saying we don't get to consider that, whether Finnerty has an answer for the dispute     has an answer for the dispute issue. That is clearly subject to the clear error standard. This is Judge Quaddi's assessment of the competing expert testimony on this question. He says directly into the record, I have read every single one of these articles, I have  them to what the SEC filed. What does Finnerty say that rebuts that? Because you focus on the denials, but not all 36 of those articles have denials. Most of them didn't. Well, many of them may not have denials, but they expressly reject the assertion that there are deeply problematic or undisclosed conflicts. Everybody knows Goldman has conflicts. That's supposed to be the genius of it, not the bug of it. The question is can they navigate the conflicts? Can they successfully disclose the conflicts? Can they manage the business that way? The fact that they were breaking the rules of the market is the problem. There is one other feature of the legal standard that I think is not getting enough play. It will someday be disaggregation question. We have to prove that the price change is due to the statement. That will eventually be part of the case. The question now is did it affect the price at all? That means did they prove that the misstatements had no effect on the price despite the fact that they were misstatements?   were misstatements, then we should assume their material, which is the same thing as saying there is a price impact. All I'm saying is this. The other side cannot defeat price impact with an argument that is the equivalent of these statements. An expert who says investors don't care about this generic stuff, we don't get to consider that. My point is it can't carry the day alone. The Supreme Court said the genericness is evidence. They have evidence on their side. We have nothing. That is not how this works. The burden is on them to show no price impact. The question is who proves that this is not a trial on the merits. The burden is on them and the way they meet their burden is that it had no price impact. Not some or  bit. It is no price impact. Can you tick off the evidence that there was a price impact? Do you have Dr. Kennedy's testimony? There are a variety of pieces of evidence. I will give you the most persuasive ones. One is the Goldman article. The other is the Merrill Lynch report. There are two other articles that link the price decline to the marketplace. One is the Wall Street Journal article.  directly links the enforcement action to reputation damage to Goldman and his public positions. The other is an associated press report. I believe so. Just remember, I think, that it is also when it comes to the burden of proof, once we have established the premise and once we know there is this massive stock decline, they will need to come up with some explanation for the entire decline in the price and I don't think they can do that. If I could then just turn to the other arguments that I think my friend ... Yes, exactly. Because we are talking about the common sense that the market had to have concluded that something was much more afoot than merely the problem of the abacus transaction itself. I take my friend who made five other arguments if I could touch                                     on that one    you. Thank you. Thank you. Thank you. Thank you.